**Roderick I. CAMPBELL, Plaintiff,**

**v.**

**GENERAL DYNAMICS GOVERNMENT SYSTEMS CORPORATION and Richard Schnorbus, Defendants.**

**No. CIV.03–11848–NG.**

United States District Court, D. Massachusetts.

June 3, 2004.

Claudia T. Centomini, Foley Hoag LLP, Boston, MA, Arthur G. Telegen, Foley Hoag LLP, Boston, MA, for General Dynamics Government Systems Corporation, Richard Schnorbus, Defendants.

John N. Lewis, Boston, MA, Lawrence R. Mehl, John N. Lewis & Associates, Boston, MA, for Roderick I. Campbell, Plaintiff.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

This case presents the general question of whether an employer can take advantage of the informality and speed of email communications to notify an employee about a new and mandatory arbitration policy. The issues are significant. Defendants seek to effectively extinguish plaintiff-employee's right to a federal jury trial through the enforcement of an "agreement" he may have never known about.

Roderick I. Campbell ("Campbell") brings this case against his former employer, General Dynamics Government Systems Corporation ("General Dynamics"), and its Human Resources Director, Richard Schnorbus ("Schnorbus"), alleging that defendants discriminated against him by terminating him because of his handicap, sleep apnea, in violation of Massachusetts General Laws, Chapter 151B, and the Americans With Disabilities Act, 42 U.S.C.A. §§ 12101–12213.

Before the Court is defendants' motion [document # 5] to stay the federal court proceedings and compel Campbell to arbitrate his claims, based on a Dispute Resolution Policy ("DRP") implemented by General Dynamics during the time Campbell was employed on an at-will basis. For the reasons set forth below, defendants motion to stay these proceedings and compel arbitration is **DENIED**.

### I. RELEVANT FACTS

#### A. Campbell's Claims

Campbell was employed by General Dynamics as an at-will employee from February 18, 2000, until he was terminated on December 30, 2002. Plaintiff alleges that he suffers from sleep apnea, a condition that can disturb sleep and make it impossible to wake up in the morning, as well as cause episodes of sleep during the day. He alleges that his termination was due to his disability.

Campbell filed a charge of discrimination based on disability against defendants with the Massachusetts Commission Against Discrimination ("MCAD") on May 13, 2003. On September 4, 2003, Campbell filed a Complaint in Norfolk Superior Court. Defendants removed the plaintiff's action to federal court on September 17, 2003.

On November 10, 2003, defendants filed the present motion [document # 5], asserting that the DRP became effective on May 1, 2001, is enforceable with regard to Campbell, and requires plaintiff to refer his claims to mandatory arbitration. Defendants request that this Court stay all federal court proceedings and compel arbitration. This Court held a hearing on this motion on December 16, 2003.

### B. *The Dispute Resolution Policy and its Dissemination*

There is no dispute that the DRP, if enforceable and if read in its entirety, would require Campbell to submit his claims to arbitration. The controversy surrounding this motion centers on General Dynamics' attempt to inform plaintiff of the DRP before its implementation, and on whether it succeeded in doing so.

The parties agree that on April 30, 2001, General Dynamics sent an email message to all of its employees. The email came from "Broadcaster, NDHM [NDHM.Broadcaster@GD–NS.Com]" [document # 6, exhibit 1]. The subject line of the email was "G. DeMuro—New Dispute Resolution Policy." Gerard DeMuro was the president of General Dynamics at that time. Nowhere in the email's heading was any indication given that the email was of critical importance. There was certainly no indication that the email intended to change employees' legal rights.

The text of the message was in the form of a letter addressed "Dear Fellow Employee:", and its length was the equivalent of one full page, single spaced. The first two paragraphs of the email made no mention of the DRP, the importance of the email, or anything even remotely indicating that the email was to have the effect of taking away employees' rights to a federal judicial forum. The paragraphs were instead innocuous descriptions of General Dynamics as "a leader in a very competitive marketplace," and its "support of open, forthright and honest communication." The DRP was described in broad terms in the third paragraph; there was only a vague reference to the issues it encompassed. "[W]e have developed the Dispute Resolution Policy ('DRP') to address legal issues raised by either an employee or General Dynamics Communication Systems." [1] *Id.* The fifth paragraph noted that the DRP would become effective May 1, 2001, and only there was it first mentioned that it was "an essential element of [employees'] employment relationship." *Id.* No other reference—implicit or explicit—was made in the text of the message to the fact that General Dynamics expected its employees to be bound by the DRP if they continued working there.

The email message included two links—to "dispute_resolution.htm and DRP_Handbook_2.doc"—located on General Dynamics' internal website, which employees could access by clicking on either link with their cursor. The former, "dispute_resolution.htm," was a two-page flyer [document # 6, exhibit 2] ("the flyer"), which set out key provisions of the DRP in plain-language in a question-and-answer format. In bold, highlighted text, the flyer informed employees that the DRP is "the exclusive means of resolving workplace disputes for legally protected rights. If an employee files a lawsuit against the Company, the Company will ask the Court to

---

**1.** While it is this sentence that at least arguably made reference to legal claims being resolved through the DRP, it is important that this sentence not be considered in isolation. The sentence is the fourth in an eight sentence paragraph, and its tone is certainly not consistent with the reality that the DRP takes away rights from General Dynamics' employees.

dismiss the lawsuit and refer it to the Dispute Resolution Policy" [document # 6, exhibit 2, page 2]. Other sections of the flyer informed employees that the DRP would apply to all employees who "[c]ontinue [their] employment after the effective date of the DRP's adoption," and that "[e]mployment discrimination and harassment claims, based on, for example, . . . disability" are covered [document # 6, exhibit 2, page 2].

The latter, "DRP_Handbook_2.doc," was a 26–page handbook [document # 6, exhibit 3] ("the handbook"), which detailed the provisions of the DRP.

Campbell denies having any memory of even receiving the email. Defendants allege that Campbell opened the email, and present as evidence a "tracking log" [document # 6, exhibit 4] which indicated that Campbell opened the email at 1:56 p.m. on April 30, 2001. (The email was sent at 1:54 p.m. on that day.) However, defendants offer no evidence to support, nor do they even suggest, that Campbell clicked on either link, or that he read the text of the email.

General Dynamics did nothing but send the email to make its employees aware of the DRP. Plainly, even email technology enables the company to do better. The company did not, for example, require an employee to signify by return email that he had read the email, or more importantly, that he had read the attachments and understood their implications. General Dynamics did not require the employee to note "I accept" in a return email. Nor did it use the old fashioned ways of assuring notice. It did not hold a meeting announcing the DRP with a sign-in sheet to monitor which employees had attended.

In these days, when employees may be deluged with electronic messages and readily delete them, the question is whether a company can notify its employees of a substantial change in policy as General Dynamics did here. While email dispenses with many of the formalities of written communication, when information of this significance is conveyed, it may not be adequate.

## II. *LEGAL ANALYSIS*

██ Defendants assert that the DRP prevents Campbell from bringing his ADA claim in federal court. Campbell responds with two arguments: first, that the DRP cannot be enforceable as to him because General Dynamics' notice was insufficient, and therefore he cannot be held to have agreed to it; and second, that regardless, the DRP does not satisfy the Federal Arbitration Act, 9 U.S.C.S. §§ 1, *et seq.*, ("FAA") because electronic notification does not satisfy the FAA's "*written* agreement" requirement. Since I find that General Dynamics' efforts to notify its employees of the DRP so clearly fail against Campbell's first argument, I do not address the second.

### A. *General Dynamics' Method of Notification*

### 1. *Standard Under the FAA and Contract Law*

██ The FAA, 9 U.S.C. §§ 1 *et seq.*, provides that federal courts shall stay proceedings in any action "referable to arbitration under an agreement in writing for such arbitration" until the arbitration is complete. 9 U.S.C. §§ 3. Under the FAA, a civil action must be stayed if: (1) there is a written agreement to arbitrate; and (2) any of the issues raised are within reach of that agreement. *See MCI Telecommunications Corp. v. Exalon Industries, Inc.*, 138 F.3d 426, 429 (1st Cir.1998); *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 148 (1st Cir.1998).

██ The Supreme Court has held that agreements to arbitrate statutory employ-

ment discrimination claims are enforceable. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123–24, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Claims under both the ADA and M.G.L. c. 151B may properly be subject to arbitration. *See Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 149–50 (1st Cir.1998). The ADA expressly encourages arbitration of disputes under some circumstances. Section 12212 of the ADA states, "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under this chapter." 42 U.S.C. § 12212.

It is clear that employment discrimination claims based on disability were specifically included in the handbook (§ 4.1) and the flyer (page 2). From defendants' perspective, the contents of those documents thus constitute an agreement between General Dynamics and Campbell. But it is equally clear that employment discrimination claims were not referenced in any significant way in the body of the email message. What is more, Campbell denies ever having read the email, and challenges whether General Dynamics' method of notice was sufficient for this Court to hold that Campbell "agreed" to a policy he denies having ever been made aware of.

The key question here is thus whether, under general principles of state contract law and under the language of the ADA, the level of notice was sufficient to find that there was an agreement which encompassed those terms. *See Rosenberg v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999) (in general, state contract law governs the existence of an arbitration agreement, but the 1991 Civil Rights Act and the ADA require also that arbitration agreements be enforced "where appropriate and to the extent authorized by law"); *Brennan v. King*, 139 F.3d 258, 264 (1st Cir.1998) (*citing First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). Section 118 of the 1991 Civil Rights Act provides "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Pub.L. No. 102–166, 188, 105 Stat. 1071, 1081 (1991). *See also*, 42 U.S.C. § 12212 (parallel language under the Americans with Disabilities Act (ADA)). Obviously, if General Dynamics' method of notice was insufficient and Campbell was not aware of the proposal, there was no agreement.[2]

### 2. *The Notice Standard After Rosenberg*

 The First Circuit has held that a waiver of the right to a judicial forum for civil rights claims in exchange for continued employment "must at least be express." *See Ramirez–De–Arellano v. American Airlines, Inc.*, 133 F.3d 89, 91 n. 2 (1st Cir.1997) (quoting *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 761–62 (9th Cir.1997) (internal quotation marks

---

2. Defendants may be correct to point out that where an at-will employee would reasonably believe that a new policy embodies conditions upon which employment is to continue, the employee's continuing to work after being notified of the policy constitutes acceptance of the policy. *See O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 664 N.E.2d 843, 848 (1996); *see also Gebhard v. Royce Aluminum Corp.*, 296 F.2d 17, 19 (1st Cir.1961) (observ-

ing that, as a matter of law, upon presentation of new terms and conditions of employment, an at-will employee's options are to accept the terms or quit). Defendants' reliance on that proposition, however, assumes that Campbell was notified (or can be considered notified) of the policy. It is his challenge of that assumption which provides the primary basis for plaintiff's argument.

omitted)). Under even the loosest standards suggested by courts, an employee does not give up his statutory right to a judicial forum unless he knew he was doing so or the notice he received was sufficient to bind him despite his lack of actual knowledge (such as in the case of a party who signed an agreement without bothering to read its contents). *See Rosenberg*, 170 F.3d at 19, citing *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 80, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), and noting that the Supreme Court's holding in *Wright* that a waiver of a judicial forum set forth in a CBA must be "clear and unmistakable" to be enforceable," supports the idea that "there must be some minimal level of notice to the employee that statutory claims are subject to arbitration," although a lesser standard than "clear and unmistakable" applies in the context of private agreements. *Rosenberg*, 170 F.3d at 21.

In *Rosenberg*, the First Circuit dealt with a situation where an incoming employee had signed a form agreeing to arbitrate "any dispute, claim or controversy that may arise ... that is required to be arbitrated under the rules, constitutions, or bylaws of the organizations indicated in Item 10." The documents described in Item 10 articulated that the specific claims at issue in her case were covered by the arbitration agreement, but Merrill Lynch failed to give her those documents. In addressing whether to enforce the arbitration agreement, the Court focused on "Congress's concern that agreements to arbitrate employment discrimination claims should be enforced only where 'appropriate,' a concern not expressed in the FAA or at common law." *Rosenberg*, 170 F.3d at 19 (although the Court was dealing there with the 1991 Civil Rights Act, it explicitly noted that the ADA used the parallel language quoted above.)

It is not surprising that Congress and the courts have looked more critically at whether an employee has been given notice of mandatory arbitration in a civil rights setting than in a commercial setting. Such agreements effect a waiver of a judicial forum for civil rights claims, such as those brought under the ADA—a forum particularly important to plaintiffs.[3] Discrimination laws reflect a Congressional finding that certain groups are especially in need of federal protection in the workplace. *See Pryner v. Tractor Supply*

---

**3.** The ADA's "appropriate" language raises the bar for enforceability, but even applying basic Massachusetts contract law the DRP could not be enforced against Campbell; there was simply no valid contract. Under Massachusetts law, a valid contract requires offer, acceptance, and consideration. *See City of Haverhill v. George Brox, Inc.*, 47 Mass.App.Ct. 717, 716 N.E.2d 138 (1999). While continuing to work with the knowledge that a dispute resolution policy is a mandatory condition of continued employment can constitute acceptance (and the continued employment, consideration), an employee's knowledge of the offer is obviously a necessity for the inference of acceptance to hold. *See Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir., 2001) (enforcing a mandatory dispute resolution policy against a plaintiff bringing race and religion discrimination claims, where the plaintiff had attended a meeting announcing the policy and signed a form that stated "I have attended a DRP meeting and have received the information in regards to DRP.")

While defendants are correct that an agreement to arbitrate does not have to be signed to be enforceable, they are undoubtedly wrong if they mean to suggest an employee need not have notice of the policy. The cases to which defendants have so proudly pointed make clear that employers are required to give employees *actual notice* in order to implement a mandatory arbitration agreement. While courts have enforced unsigned agreements to arbitrate which have been disseminated in a variety of ways—mailing and office memoranda (*Howard v. Oakwood Homes Corp.*, 134 N.C.App.116, 516 S.E.2d 879 (1999)), office-wide meeting with sign-in sheet (*Hightower*, 272 F.3d 239), employee hand-

*Co.,* 109 F.3d 354, 360 (7th Cir.1997). What is more, litigation has played and continues to play a critical role in the legal and social changes that strike at the core of the purpose of discrimination laws. *See Rosenberg v. Merrill Lynch,* 995 F.Supp. 190, 197 (D.Mass.1998).

In *Rosenberg,* while the employee had admittedly signed the form, and the form undisputedly referenced mandatory arbitration, the Court held it could not be enforced. Merrill Lynch had the opportunity to make the contract sufficiently specific to put Rosenberg on notice, but it failed to do so, and even failed to provide the Item 10 documents it was required to provide under the employment agreement at issue. As the Court noted, "[g]iven Congress's concern that agreements to arbitrate employment discrimination claims should be enforced only where 'appropriate,' a concern not expressed in the FAA or at common law, Merril Lynch should, we believe, bear [the risk of plaintiff's ignorance]." 170 F.3d at 19. Even if state contract law or generally the provisions of the FAA permitted such notice, the discrimination laws did not.

### 3. *General Dynamics' Method of Notification*

General Dynamics seemed to have done as little as it could to ensure their employees were informed of a program that substantially affected their employee's legal rights. Although they hired Campbell in writing[4] and terminated him both in person and in writing, they chose to send notice of the implementation of the DRP solely by email. They sent no paper letters, and held no meetings to announce the DRP verbally. They did not ask employees to sign anything—even electronically—signifying they read and understood the DRP. They did not even take the incredibly simple and inexpensive step of configuring their system to log when and if employees clicked on the links to the flyer or the handbook.

Email is certainly an inexpensive and convenient means of notification. But those same blessings bring with them drawbacks. Whether used for work or for personal reasons, most users of email inevitably receive incredible volumes of messages. It is often hard to distinguish the important from the frivolous. It is not surprising that Campbell reported that he received between 10 to 100 daily, many of which were "mass emails ... relating to company functions, birthdays and anniversary announcements, and other trivial matters." The practice of reflexively opening (so as to remove the unread tag) and deleting a mass email without reading it, or even being aware of it, is not uncommon. Under those circumstances, to presume that Campbell read the text of the email, clicked on its links, and read the linked documents, and use that as the basis for depriving him of rights guaranteed to him by federal law, would be to show an intolerably low level of respect for those rights.

Put simply, receiving an email in a virtual mailbox is not the same as receiving a

---

books and mailing (*Reese v. Commercial Credit Corp.,* 955 F.Supp. 567, 569 (D.S.C.1997)), multiple mailings through professional mailing service tracking delivery (*Cole v. Halliburton Co.,* 2000 WL 1531614, *3 (W.D.Okla. Sept.6, 2000)), office memorandum (*Van Slyke v. Commercial Credit Corp.,* 1995 WL 766399, *1 (N.D.N.Y. Dec.29, 1995))—in each and every case the court made a finding that the plaintiff had actual notice of the policy.

4. The phrase "in writing" is used here to distinguish paper from email, and is not a statement regarding whether or not email is ever sufficient to satisfy the FAA's "written agreement" requirement. Because the notice here was so clearly insufficient, it is unnecessary for this Court to decide that question.

letter in a real mailbox.[5] Showing that someone opened an email is not the same as showing that they acknowledged it. There are a number of simple ways, as I have described above, that the sender of an email can monitor what its recipient has done with it. General Dynamics chose only to utilize the most superficial of these. As a result, we know nothing about Campbell's interaction with the email and its attachments except for the fact that, according to General Dynamics' tracking log, he opened it.

I find that sending a mass email message, without more, fails to constitute the minimal level of notice required by the First Circuit under *Rosenberg* and other decisions.

### 4. The Risk of Ignorance Must Fall on General Dynamics

■ Considering its ability to control the level of notice and taking into account the significance of the rights General Dynamics was attempting have its employees waive, it is clear that General Dynamics

should bear the risk of ignorance for those employees who did not choose to read the email and its attachments. *See Rosenberg,* 170 F.3d at 19.[6]

It was General Dynamics who not only drafted the policy, but determined the way it would be disseminated. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (noting the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it"). It was General Dynamics who could have cheaply and easily announced the change in a way that would have ensured that Campbell and every other employee knew. It seems only appropriate that General Dynamics now bear the risk associated with its minimal effort.[7]

### B. General Dynamics Cannot Establish that Campbell Was Actually Aware of the DRP

If Campbell had actually been aware of General Dynamics' plan to implement the

5. This reality can be seen even in this district court's own policies. Although an electronic case filing system ("ECF")has been implemented within the last year, which allows pleadings to be filed electronically with only email notice to participants, the initial service of process must still be done by hand, and parties are only responsible for email notice after they have signed up to be a participant in the system.

Indeed, the early experience with ECF provides a cautionary tale. When the Court sent out email notification to attorneys of their log-in names and passwords, with the return email address "mad.uscourts.gov," many attorneys deleted it, not understanding its significance.

*See also* A. Michael Froomkin, ICANN'S "Uniform Dispute Resolution Policy"—Causes and (Partial) Cures, 67 Brook. L.Rev. 605, 650 (Spring, 2002) (criticizing Internet Corporation for Assigned Names and Numbers' policy for mandatory arbitration-like process, under which notice of dispute, triggering deadlines for reply, started to run when no-

tice was emailed, regardless of when or if it was read.)

6. In *Rosenberg,* the First Circuit held that the employer should bear the risk, although it is significant to note that facts in that case weighed more heavily on both sides than in the present case. Rosenberg had signed a form that referenced that the NYSE rules would apply to her employment. It is a traditional rule of contract law that a party to a contract is assumed to have read and understood the terms of a contract she signs. *See Id.,* n. 17 (citing *Tiffany v. Sturbridge Camping Club, Inc.,* 32 Mass.App.Ct. 173, 587 N.E.2d 238, 240 n. 5 (1992)). However, the form signed by Rosenberg and her employer also required the employer to provide Rosenberg with a copy of the NYSE rules and ensure that she was familiar with them. Rosenberg's employer failed to do that.

7. Considering that it would have been virtually free (both in terms of time and money) for General Dynamics to ensure its employees

DRP, despite General Dynamics' plainly insufficient method of notification, the policy might still be enforceable. But plaintiff has asserted that he had no knowledge of the DRP, and defendants have offered no evidence to contradict his assertion that, whether he opened the email or not, he was never aware of its contents and the significance of the DRP. Given General Dynamics' means of notification, I have no reason to doubt Campbell's claim. For the reasons described in detail above, I will not assume that Campbell was aware of the email's contents simply because he clicked to open it.

### C. The FAA's Written Agreement Requirement

Because Campbell's first argument is so clearly dispositive of defendants' motion, it is unnecessary for this Court to address whether an email message can satisfy the FAA's written agreement requirement.

## III. CONCLUSION

For all of the foregoing reasons, defendants' motion to stay the proceedings and compel submission of plaintiff's claims to General Dynamics' DRP [document # 5] is **DENIED**.

**SO ORDERED.**

---

knew of the policy, yet it chose not to do so, the company's motives in designing its dissemination method could be questioned.

However, it is unnecessary to attach any malignant intent to General Dynamics' notification efforts to find that they were insufficient.